IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF TEXAS
TYLER DIVISION

| JUXTACOMM-TEXAS SOFTWARE, LLC, | § |  |
|---|---|---|
|  | § |  |
| Plaintiff | § |  |
|  | § | CASE NO. 6:10CV11 |
| vs. | § | PATENT CASE |
|  | § |  |
| AXWAY, INC., et al., | § |  |
|  | § |  |
| Defendants | § |  |

## MEMORANDUM OPINION AND ORDER

Defendant SAS Institute, Inc.'s Motion to Disqualify Plaintiff's Counsel (Docket No. 117) is before the Court. Having considered the parties' written submissions and oral arguments, the Court previously denied the motion. Docket No. 388. This opinion sets forth the Court's reasoning for that denial. Further, the Court **LIFTS** the previously imposed stay of discovery related to SAS and Dataflux Corporation. *See* Docket No. 366.

## BACKGROUND

Michael Kiklis, an attorney at the Akin Gump Strauss Hauer & Feld LLP law firm, attended law school with Timothy Wilson, an in-house attorney for SAS.[1] Over the years, Kiklis has sought work from SAS through Wilson. In 2007, SAS hired Kiklis to give his opinion on a cross-license deal with IBM ("IBM matter"). At about the same time, Kiklis brought a patent infringement suit on behalf of JuxtaComm against various defendants ("*JuxtaComm I*").[2] SAS was not a defendant

---

[1] Kiklis Declaration, Response to Motion to Disqualify, Docket No. 163-1 at ¶2.

[2] *JuxtaComm Techs., Inc. v. Ascential Software Corp.*, 2:07cv359 (E.D. Tex. Aug. 17, 2007) (Davis, J.).

1

in *JuxtaComm I*, but SAS's products were asserted by the defendants as prior art in *JuxtaComm I*.

Kiklis worked on the IBM matter intermittently between the summer of 2007 and March 2008. Kiklis offered to perform additional work on the IBM matter, or other matters, but SAS declined his repeated offers. In total, Kiklis billed SAS 2.4 hours for his work on the IBM matter. Kiklis performed no additional work for SAS after March 2008. SAS and IBM executed the cross license in December 2008, but Kiklis was not informed the agreement had been finalized. In November 2009, Kiklis emailed Wilson and asked if he could close the matter, and Wilson said yes.

In January 2010, Kiklis, still with Akin Gump, brought this suit on JuxtaComm's behalf ("*JuxtaComm II*") against another group of defendants, including SAS. SAS moves to disqualify Kiklis and Akin Gump arguing that Kiklis's representation of JuxtaComm in this suit and Kiklis's work on the IBM matter are conflicts of interest.

## APPLICABLE LAW

As disqualification is a procedural matter not unique to patent law, regional circuit law applies. *Picker Int'l, Inc. v. Varian Assocs., Inc.*, 869 F.2d 578, 580–81 (Fed. Cir. 1989). The movant bears the burden of proving that disqualification is warranted. *In re Am. Airlines, Inc.*, 972 F.2d 605, 614 (5th Cir. 1992); *Duncan v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 646 F.2d 1020, 1028 (5th Cir. 1981). "Motions to disqualify are substantive motions affecting the rights of the parties and are determined by applying standards developed under federal law." *In re Dresser Indus., Inc.*, 972 F.2d 540, 544 (5th Cir. 1992). Federal courts are not bound by state ethical rules; they may also look to national norms, such as the ABA Model Rules. *In re Am. Airlines, Inc.*, 972 F.2d at 610. The attorney disqualification rules are not to be mechanically applied. *See Johnston v. Harris County Flood Control Dist.*, 869 F.2d 1565, 1569 (5th. Cir. 1989). "All of the facts

2

particular to a case must be considered, in the context of the relevant ethical criteria and with meticulous deference to the litigant's rights." *F.D.I.C. v. U.S. Fire Ins. Co.*, 50 F.3d 1304, 1314 (5th Cir. 1995).

The ABA Model Rules and the Texas Rules of Professional Conduct propound different tests for conflicts of interest arising in concurrent and former representations.

ABA Model Rule 1.7 governs concurrent conflicts of interest:

> Except as provided in paragraph (b), a lawyer shall not represent a client if the representation involves a concurrent conflict of interest. A concurrent conflict of interest exists if :
> (1) the representation of one client will be directly adverse to another client; or
> (2) there is significant risk that the representation of one or more clients will be materially limited by the lawyer's responsibilities to another client, a former client or third person or by a personal interest of the lawyer.

ABA MODEL RULE 1.7(a). The Texas Rule requires not only that the clients are directly adverse but also that the matters are substantially related. *See* TEX. R. DISCIPLINARY P. 1.06(b), *reprinted in* TEX. GOV'T CODE ANN., tit. 2, subtit. G app. A-1 (Vernon Supp. 1997). The Fifth Circuit has shown a preference for the more stringent ABA Model Rule. *In re Dresser*, 972 F.2d at 544. Thus, the Court will apply the Model Rule to the present facts.

For conflicts involving former representations, the movant must prove either that the present and former matters are substantially related or that the former attorney actually possesses relevant confidential information. *In re Am. Airlines*, 972 F.2d at 615; *see also,* ABA MODEL RULE 1.09; TEX. R. DISCIPLINARY P. 1.09.

## ANALYSIS

As there are different rules for conflicts of interest arising in concurrent and former

representations, the first issue is whether SAS was a current or former client when the conflict arose. Thus, the Court must determine when Kiklis's representation of SAS ended and when the conflict arose.

*When the Representation Ended*

SAS contends Kiklis's representation continued until *JuxtaComm II* was filed or alternatively ended at the earliest in November 2009 when Kiklis asked Wilson if he could close the file. JuxtaComm contends Kiklis's representation of SAS ended, at the latest, in December 2008 when SAS and IBM executed their cross-license agreement.

The general rule is that representation of a client ends when the purpose of that representation ends. *Simpson v. James*, 903 F.2d 372, 376 (5th Cir. 1990); *Revise Clothing, Inc. v. Joe's Jeans Subsidiary, Inc.*, 2010 WL 481206 at *7–8 (S.D.N.Y. Jan. 13, 2010); *Stephenson v. LeBouf*, 16 S.W.3d 829, 836 (Tex. App.—Houston [14th Dist.] 2000, pet. denied). That Kiklis confirmed with Wilson that he could close the file in November 2009 does not mean that the representation continued until that date. *See Revise Clothing*, 2010 WL 481206 at *9 (formal termination is not required to end the attorney-client relationship).

In July 2007, SAS hired Kiklis to work on the IBM matter. Specifically, SAS hired Kiklis to "review the deal points that IBM has provided and a general discussion of the development of the deal" and "to provide SAS with feedback based upon your prior experience on matters like these." July 24, 2007 email from Wilson to Kiklis.[3] SAS limited the representation to approximately two hours of work. *Id*. ("My manager would like to keep this to a 2 hour engagement at this point.").

---

[3] Exhibit 1 to Kiklis's Declaration in support of JuxtaComm's Response to the Motion to Disqualify, Docket No. 163-2 at 2 of 3.

The formal engagement letter between SAS and Kiklis stated that "the relationship between [SAS] and [Akin Gump] will be terminated upon completion of the above-referenced matter."[4] The letter referenced the matter as the IBM/SAS Patent License.[5]

Kiklis worked on the IBM matter in August 2007 and March 2008. In August 2007, Kiklis billed .4 hours on the matter.[6] In March 2008, Kiklis billed 2.0 hours on the matter.[7] At the end of March 2008, Kiklis and Wilson discussed a multi-step process to further review the IBM matter, which Wilson then discussed with his supervisor on April 1, 2008.[8] On April 23, 2008, Wilson informed Kiklis that SAS was going to use another strategy and in response to Kiklis's solicitation for more work stated he "[didn't] expect anything new in the near term."[9]

In August 2008, Kiklis sought additional work from Wilson on other matters.[10] In his email to Wilson, Kiklis stated, "I hope . . . that the IBM situation worked out for you," clearly stating his understanding that the work for which he had been previously hired was complete.[11] Wilson responded that SAS was "still actively working on the IBM situation" and that he "suspect[ed] that

---

[4] Exhibit 2 to Kiklis's Declaration, Docket No. 163-3 at 5 of 5.

[5] *Id.* at 2 of 5.

[6] Exhibit 4 of Kiklis's Declaration, Docket No. 163-5 at 4 of 5.

[7] Exhibit 6 to Kiklis's Declaration, Docket No. 163-7 at 2 of 3.

[8] Exhibit 9 & 10 to Kiklis's Declaration, Docket Nos. 163-10 & 163-11.

[9] Exhibit 10 to Kiklis's Declaration, Docket No. 163-10.

[10] Exhibit 11 to Kiklis's Declaration, Docket No. 163-12.

[11] *Id.* at 3 of 3.

at some point, we may need your help again – even if it is only during the agreement phase."[12] In December 2008, SAS and IBM finalized and executed their cross-license agreement without additional work from Kiklis and Akin Gump. It is undisputed that Kiklis and Akin Gump did no further work for SAS after April 2008.

At the latest, Kiklis's representation of SAS ended in April of 2008. Kiklis was hired specifically to review the deal points and provide SAS feedback. Kiklis's role was not to represent SAS in its ongoing negotiations with IBM until an agreement was reached. Kiklis was never provided the full agreement, in draft or final form, for his review. Kiklis was not informed when the agreement was executed. Kiklis repeatedly sought additional work on this or other matters from SAS and was repeatedly turned down. The last work Kiklis did on the matter was in March 2008. In April 2008, Wilson informed Kiklis that SAS had decided to use another strategy—that did not require further work from Kiklis—and that Wilson did not expect to have more work for Kiklis in the near term. Thus, Kiklis completed the work he was hired to do no later than April 2008. It is unreasonable for SAS to believe that Kiklis remained its attorney once he had completed the tasks he was hired to perform and SAS refused his requests for additional work. *Artromick Int'l, Inc. v. Drustar, Inc.*, 134 F.R.D. 226, 230 (S.D. Ohio 1991) ("absent either a specific act or statement by either party that shows clearly what that party's intent actually was, the law will imply an end to the [attorney-client] relationship where it would be objectively unreasonable to continue to bind the parties to each other").

SAS attempts to expand Kiklis's representation of SAS by mischaracterizing the work it hired Kiklis to perform. The evidence submitted to the Court refutes SAS's characterizations. SAS

---

[12] *Id.* at 2 of 3.

states it hired Akin Gump to "help in the negotiations with IBM and to possibly defend SAS in any resulting litigation."[13] However, Wilson's email to Kiklis that attached the engagement agreement clearly stated that Kiklis was only tasked with reviewing the deal points and providing SAS with feedback. The email also demonstrates that SAS desired to restrict the work to a two-hour engagement.[14] Finally, the email states that "SAS may have *additional* work if this goes well."[15] All of these statements contradict SAS's current assertion that Kiklis was also hired to defend SAS in any resulting litigation arising out of the IBM matter. Also contradicting this position is that Kiklis was never shown the actual agreement between SAS and IBM, nor was he informed when the agreement had been finalized. If SAS had genuinely intended to hire Kiklis to represent it in future litigation, the Court expects that Kiklis would have been more involved in the IBM matter itself.[16]

After considering SAS's assertions about what happened, JuxtaComm's assertions, and the affidavits in support of both sides, it appears that SAS hired Kiklis for a very limited engagement, which ended no later than April 2008.

*When the Conflict Arose*

SAS contends the conflict arose as early as April 2008, when the *JuxtaComm I* defendants submitted their invalidity contentions that included SAS's earlier products as prior art. JuxtaComm contends the conflict arose in January 2010 when *JuxtaComm II* was filed or at the earliest in the fall

---

[13] Motion, Docket No. 117 at 5 of 19.

[14] Exhibit 1 to Kiklis's Declaration, Docket No. 163-2 at 2 of 3.

[15] *Id*. (emphasis added).

[16] SAS also states that Kiklis did additional work for SAS that Akin Gump did not bill for. Motion, Docket No. 117 at 8 of 19. In contradiction, Kiklis filed an affidavit in which he describes all of the work he performed for SAS and states that he billed for all of the time he worked. Kiklis's Declaration, Docket No. 163-1 at ¶ 23.

7

of 2009 when JuxtaComm first contemplated bringing this suit.

SAS argues that the conflict arose when SAS's prior art was asserted against JuxtaComm in *JuxtaComm I*. The use of SAS's prior art against JuxtaComm in *JuxtaComm I* did not automatically create a conflict of interest. SAS has not demonstrated what interest it had, if any, in proving JuxtaComm's patent invalid during *JuxtaComm I*. SAS seems to argue that JuxtaComm and Kiklis should have realized during *JuxtaComm I* that SAS's current products may infringe under JuxtaComm's infringement theory since SAS's earlier products were asserted against JuxtaComm's patent. However, there is no evidence that JuxtaComm or Kiklis had any knowledge of SAS's current products. On the other hand, SAS admits that it was aware of *JuxtaComm I* and that it provided information to at least one of the *JuxtaComm I* defendants about SAS's prior art.[17] There is also evidence that SAS knew that Kiklis represented JuxtaComm in *JuxtaComm I*.[18] Yet, SAS did not raise the issue of a potential conflict with Kiklis. Accordingly, the use of SAS's prior art in *JuxtaComm I* did not create a conflict of interest.

Wilson also states that Kiklis told him SAS was not sued in *JuxtaComm I* because SAS was Kiklis's current client.[19] Kiklis's declaration contradicts SAS's characterization of that conversation.[20] Kiklis's declaration is more believable.

Alternatively, SAS contends that since JuxtaComm has asserted a claim of willful infringement, JustaComm and Kiklis must have been aware of SAS's alleged infringement in 2008.

---

[17] SAS's Answer (Docket No. 192) at 12.

[18] Kiklis's Declaration attached to JuxtaComm's Sur Reply (Docket No. 240-1) at ¶ 2.

[19] Wilson's Declaration, Docket No. 117-7 at ¶ 11.

[20] Wilson's Declaration, Docket No. 163-1 at ¶ 10.

SAS's argument is nonsensical. Willful infringement is an allegation that the accused infringer acted in an objectively reckless manner with regard to the patent holder's rights. *In re Seagate Tech., LLC*, 497 F.3d 1360, 1371 (Fed. Cir. 2007). In SAS's answer, SAS admitted that it was aware of *JuxtaComm I* and provided prior art to the *JuxtaComm I* defendants.[21] After SAS answered and admitted prior knowledge of *JuxtaComm I*, JuxtaComm amended its complaint to add a willful infringement allegation.[22] JuxtaComm's allegation that SAS willfully infringed the patent does not mean that JuxtaComm was aware of SAS's alleged infringement during *JuxtaComm I*. Rather, the willful infringement allegation is that SAS knew of the patent during *JuxtaComm I* and yet continued to infringe. Accordingly, JuxtaComm's willfulness allegation is not evidence that JuxtaComm or Kiklis were aware of any conflict between SAS and JuxtaComm during *JuxtaComm I*.

JuxtaComm first contemplated suing SAS in the fall of 2009. Kiklis Declaration, Docket No. 163-1 at ¶20. Indeed, in its motion SAS argued that JuxtaComm's pre-suit investigation and contemplation of suit occurred in the fall of 2009.[23] Based on Kiklis's declaration, the conflict arose in the fall of 2009.

The conflict between JuxtaComm and SAS arose in the fall of 2009, when JuxtaComm began contemplating bringing this suit. This was more than twelve months after Kiklis's representation of SAS ended. Accordingly, the conflict did not arise while JuxtaComm and SAS were concurrent clients, and the rules for concurrent conflicts of interest do not apply.

---

[21] SAS's Answer (Docket No. 192) at 12.

[22] JuxtaComm's First Amended Complaint, Docket No. 173 at ¶ 40.

[23] Motion to Disqualify, Docket No. 117 at 11 of 19.

**Former Representation Analysis**

Counsel may be disqualified for conflicts involving a former representation if the movant proves either that the present and former matters are substantially related or that the former attorney actually posseses relevant confidential information. *See In re Am. Airlines*, 972 F.2d at 615; *see also,* ABA MODEL RULE 1.09; TEX. R. DISCIPLINARY P. 1.09. SAS does not contend that the present and former matters are substantially related, but only contends that Kiklis possesses relevant confidential information.

SAS contends that Kiklis received the following confidential information during his prior representation of SAS: (1) SAS's method for evaluating patent-infringement allegations,[24] (2) the existence and use of prior art within SAS,[25] and (3) SAS's internal power structure.[26]

SAS submitted the specifics of the confidential information that was allegedly shared with Kiklis for *in camera* review; thus Kiklis and Akin Gump do not know specifically what relevant confidential information SAS contends they possess. However, Kiklis denies receiving any confidential information. Accordingly, there is a factual dispute about whether Kiklis and Akin Gump received this information. After reviewing both declarations, Kiklis's declaration that he did not receive confidential information is more believable. However, even if Kiklis did receive this information, it would not require disqualification.

---

[24] *See* Motion to Disqualify, Docket No. 117 at 12; Exhibit C to Reply to Motion to Disqualify, Docket No. 190-5 at ¶ 6–8, submitted unredacted for *in camera* review.

[25] *See* Motion to Disqualify, Docket No. 117 at 12; Exhibit C to Reply to Motion to Disqualify, Docket No. 190-5 at ¶ 5, submitted unredacted for *in camera* review.

[26] *See* Motion to Disqualify, Docket No. 117 at 12, Exhibit C to Reply to Motion to Disqualify, Docket No. 190-5 at ¶ 9, submitted unredacted for *in camera* review.

*Method for Evaluating Patent-Infringement Allegations*

SAS contends that Kiklis advised SAS on a strategy for determining the amount to pay for a patent license and that Kiklis is aware that SAS adopted that strategy in part. SAS contends that JuxtaComm could use this knowledge to demand a certain royalty rate or to develop its damages theories and discovery strategies. Apart from Wilson's declaration, there is no evidence—direct or circumstantial—that Kiklis provided any general strategy to SAS relating to what amount of money SAS should consider paying for a license. Given Akin Gump's billing records that JuxtaComm provided and both sides' description of the exchanges between Wilson and Kiklis, at most, Kiklis may have spoken generally about license amounts in the industry based on his experience. There is no evidence that Kiklis did any work for SAS outside the IBM matter or created any specific strategy for SAS to use to determine how to value a patent license for future litigation or negotiations. Moreover, SAS regularly uses another law firm to defend it in patent litigation. That SAS would rely on Kiklis, who did 2.4 hours of work for SAS, to come up with a global strategy to value alleged infringement and not the firm that regularly defends it and is thus much more familiar with its products and profits contradicts logic. Accordingly, this information does not support disqualification.

The information described in paragraphs 7–8 of Wilson's *in camera* declaration does not support disqualification.[27] This information is common-sense, good business negotiation and settlement practice, not at all unique to SAS, and does not justify disqualification.

---

[27] Exhibit C to Reply to Motion to Disqualify, Docket No. 190-5 at ¶ 7–8, submitted unredacted for *in camera* review.

*Use of Prior Art*

SAS contends that JuxtaComm could use the information about SAS's prior art to develop its infringement and discovery strategies or attack SAS's invalidity positions.[28] However, SAS's prior art was asserted against JuxtaComm in *JuxtaComm I*. Thus, JuxtaComm was already aware that SAS had earlier products that could be asserted as prior art when JuxtaComm brought suit against SAS. SAS does not explain, in light of JuxtaComm's knowledge of SAS's prior art from *JuxtaComm I*, what additional information Kiklis received or how that additional information could be used against SAS here. Accordingly, this information does not support disqualification.

*SAS's Internal Power Structure*

SAS's supposedly confidential information about its corporate structure does not warrant disqualification. This is information that would become readily apparent to JuxtaComm during the course of mediation or through an interrogatory asking who SAS's settlement decision makers are. Moreover, SAS describes how SAS can use its power structure in negotiations but makes no arguments as to how JuxtaComm's knowledge SAS's structure could be used against SAS. SAS does not explain how JuxtaComm might change its settlement strategy in light of allegedly knowing these facts. Accordingly, knowledge of SAS's internal power structure does not justify disqualification.

Finally, even if any of this information did create a conflict of interest, disqualification would not be warranted under the Fifth Circuit's balancing requirement. In the Fifth Circuit, courts must balance the ethical rules and the social interests at stake. *U.S. Fire Ins. Co.*, 50 F.3d at 1314. Specifically, a court considers "'whether a conflict has (1) the appearance of impropriety in general,

---

[28] Exhibit C to Reply to Motion to Disqualify, Docket No. 190-5 at ¶ 5.

or (2) a possibility that a specific impropriety will occur, and (3) the likelihood of public suspicion from the impropriety outweighs any social interests which will be served by the lawyer's continued participation in the case.'" *Id*. (quoting *In re Dresser*, 972 F.2d at 544).

Kiklis represented SAS on an undisputedly unrelated matter over a year before he represented JuxtaComm in this suit. This does not have the appearance of impropriety. Further, there is little risk that any impropriety will occur. The confidential information that SAS contends it communicated to Kiklis is of a general business practice nature that is predominantly not specific to SAS. SAS contends that JuxtaComm and Akin Gump have already breached SAS's privilege by what they submitted in response to SAS's motion. However, SAS put its privileged communications at issue by filing the motion and mischaracterizing the facts related to Kiklis's representation of SAS. Thus far, Akin Gump has only responsibly used any privileged information it has to defend itself against this motion.

Finally, the possibility of public suspicion is far outweighed by JuxtaComm's interest in Akin Gump's continued representation. From their representation in *JuxtaComm I*, Kiklis and Akin Gump are already intimately familiar with the patent in suit, the technology at issue, and the legal and factual theories of the case. To force JuxtaComm to obtain new counsel would greatly increase JuxtaComm's expense and severely prejudice JuxtaComm in this action. SAS argues that JuxtaComm would not be prejudiced because the case is still in its early stages. However, SAS ignores the importance of the work that Kiklis and Akin Gump did in *JuxtaComm I*. Thus, even if the Court were to find that there was a conflict of interest based on the facts as SAS presents them, disqualification would not be justified under the Fifth Circuit's balancing test.

## CONCLUSION

Accordingly, the Court **DENIES** SAS's motion to disqualify. The Court previously stayed discovery as to SAS and its subsidiary Dataflux Corporation pending resolution of the disqualification motion. Docket No. 366. Having resolved the motion, the Court **LIFTS** the stay.

**So ORDERED and SIGNED this 29th day of November, 2010.**

_____
**LEONARD DAVIS
UNITED STATES DISTRICT JUDGE**